## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PENNSYLVANIA REAL ESTATE<br>INVESTMENT TRUST, *et al.*[1],<br><br><br><br>Debtors. | Chapter 11<br><br><br>Case No. 23-11974 (KBO)<br><br>(Jointly Administered)<br><br>Re: D.I. 15<br><br>Hearing Date: January 19, 2024, at 10:00 a.m. ET<br><br>Objection Deadline: January 16, 2024, at 5:00 p.m. ET for U.S. Trustee |

## UNITED STATES TRUSTEE'S OBJECTION TO THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF PENNSYLVANIA REAL ESTATE INVESTMENT TRUST AND ITS DEBTOR-AFFILIATES

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U. S. Trustee"), through his counsel, files this objection (the "Objection") to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pennsylvania Real Estate Investment Trust and its Debtor-Affiliates* (the "Plan") and in support of his Objection, states:

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/PREIT2023. The corporate headquarters and the mailing address for the Debtors is 2005 Market Street, Suite 1000, Philadelphia, PA 19103.

1

## PRELIMINARY STATEMENT

1.      The U.S. Trustee objects to confirmation of the Plan for the following reasons:

- The Plan includes an exculpation provision which purports to cover acts that occurred prior to the petition date.

- The Plan includes a definition of "Releasing Parties" that includes "all holders of claims or interests," (with certain exceptions) which appears to include parties that are unimpaired and those deemed to reject the plan, without opportunity for those parties to indicate their assent to granting the releases. Therefore, the Plan attempts to extract releases from these parties non-consensually. Further, the Plan does not meet the requirements for non-consensual releases.

- The Plan should not be confirmed unless it includes language that assures that "unimpaired" claimants are not bound by the releases or the injunction until their claims are satisfied in full.

2.      For these reasons, all as set forth more fully below, the U.S. Trustee requests that this Court deny confirmation of the Plan.

## JURISDICTION, VENUE, AND STANDING

3.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

4.      Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United*

*States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

5.    Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

6.    Pursuant to 11 U.S.C. § 307, the U. S. Trustee has standing to be heard with regard to Plan confirmation and this Objection.

## FACTUAL BACKGROUND

7.    The above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court on December 10, 2023 (the "Petition Date").

8.    On the Petition Date, the Debtors filed their *Joint Prepackaged Chapter 11 Plan of Reorganization of Pennsylvania Real Estate Investment Trust and its Debtor-Affiliates* [D.I. 15].

9.    Also on the Petition Date, the Debtors filed their *Motion of the Debtors for Entry of an Order (I) Scheduling the Combined Hearing on Adequacy of the Disclosure Statement and Confirmation of the Prepackaged Plan, (II) Establishing Deadlines to Object to the Disclosure Statement and Prepackaged Plan, (III) Approving the Prepetition Solicitation Procedures, (IV) Approving the Form and Manner of the Combined Hearing Notice, (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases, (VI) Conditionally Directing that a Meeting of Creditors not be Convened, (VII) Waiving the Requirement of Filing Schedules, Statements of Financial Affairs and Rule 2015.3 Reports, (VIII)*

*Limiting the Requirement as to Certain Equity Security Holdings Disclosures and (IX) Granting Related Relief* [D.I. 13], which was granted [D.I. 69].

10.     No official committee of unsecured creditors has been appointed in these cases.

**The Plan**

11.     The Plan classifies the various claims and interests into 12 classes. Priority, Other Secured Claims, Property-Level Debt Guaranty Claims, and Prepetition First Lien Claims are unimpaired and deemed to accept the Plan. Prepetition Second Lien Claims are receiving a pro-rata share of 65% of the New Common Stock, are impaired, and are the only voting class. General Unsecured Creditors are unimpaired, either being paid in full on the Effective Date or in the ordinary course of business and are deemed to accept the Plan. Intercompany Claims and Interests will be either reinstated or cancelled and will be deemed to accept or reject as applicable. Equity security holders and section 510(b) claimants are fully impaired and are deemed to reject the plan.  Plan Art. II.B.

12.     The Plan contains various provisions and interrelated definitions concerning exculpation and releases.

13.     In the Plan, the definition of "Related Parties" reads as follows:

"Related Parties" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates (whether by operation of law or otherwise) and (b) such Entity's and such Entity's current and former Affiliates' ***directors, managers, officers***, ***shareholders, equity holders*** (regardless of whether such interests are held directly or indirectly), investment committee members, special or other committee members, affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, managed accounts or funds or investment vehicles, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents

(including any disbursing agent), advisory board members, financial advisors, actuaries, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, independent contractors, representatives, advisors, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities laws), each solely in their capacities as such, (including any other attorneys or professionals retained by any current or former director, trustee or manager in his or her capacity as director, trustee or manager of an Entity), and the respective heirs, administrators, executors, estates, servants and nominees of the foregoing.

Plan at Art. I.A. 122. (emphasis added).

14.     In the Plan, the definition of "Released Parties" reads as follows:

"Released Parties" means collectively and each of, and in each case in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Lenders; (d) the Agents; (e) the DIP Lenders (including the commitment parties); (f) the Prepetition Secured Parties; (g) the New Agent; (h) the Exit Facility Lenders; (i) the Exit Facility Backstop Parties; and (j) each Related Party of each Entity in clause (a) through this clause (k); *provided*, *however*, that, notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

Id. at Art. I.A.123. Notably, through the inclusion of a "Related Party" in this definition, various

third parties, like the Debtors' directors, managers, and officers are "Released Parties."

15.     In the Plan, the definition of "Releasing Parties" reads as follows:

"Releasing Parties" means collectively and each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Lenders; (d) the Agents; (e) the DIP Lenders (including the commitment parties); (f) the Prepetition Secured Parties; (g) the New Agent; (h) the Exit Facility Lenders; (i) the Exit Facility Backstop Parties; **(j) all Holders of Claims or Interests unless, as applicable, they (i) submit a ballot by the voting deadline that does not vote to accept the Plan, (ii) submit a ballot by the voting deadline that accepts the Plan but opts out of the Third-Party Release, or (iii) timely File on the docket of the Chapter 11 Cases an objection to the Third-Party Release; and (k) each Related Party of each Entity in clause (a) through this clause (j),** solely to the extent the pertinent Entity can bind any such Related Party to the terms of this Plan under applicable law;

5

provided that, for the avoidance of doubt, each Holder of Claims or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of or File an objection to the Third-Party Release.

*Id*. at Art. I.A. 124 (emphasis added). Through the inclusion of a "Related Party" in this definition,

each of the Debtors' shareholders and equity holders is a "Releasing Party."

16.     In the Plan, the Releases by the Releasing Parties ("Third Party Release") provision reads as follows:

As of the Effective Date, ***each Releasing Party*** is deemed conclusively, absolutely, unconditionally, irrevocably and forever to ***have released each Released Party from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, and Causes of Action, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or in equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of anyone claiming by or through the Releasing Parties, based on or relating to or in any manner arising from, in whole or in part, the Debtors*** (including the management, ownership, or operation thereof or otherwise), the purchase, sale or rescission of any security of the Debtors, the business or contractual arrangements between any Debtor and any other entity, the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility Backstop Agreement, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the New Common Stock, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the Exit Facility Backstop Agreement, the New Common Stock, the Chapter 11 Cases, the filing of the Chapter 11

6

Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or in all cases upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release: (1) claims or liabilities arising from any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence each solely to the extent as determined by a Final Order; (2) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Revolving Exit Facility and TL Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Revolving Exit Facility and TL Exit Facility) executed to implement the Plan or the Restructuring Transactions; or (3) the rights of any Holder of Allowed Claims and Allowed Interests to receive distributions under the Plan.

*Id.* at Art. VIII.D. (emphasis added).

17.     In the Plan, the Exculpation Provision reads as follows:

Except as otherwise specifically provided in the Plan, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be exculpated from any Cause of Action for any claim related to any act or omission **occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of (i) the Chapter 11 Cases and (ii) and other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in connection with the Plan,** including the formulation, preparation, dissemination, solicitation, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Solicitation Materials, the Plan, the Plan Supplement, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the New Common Stock, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Solicitation Materials, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the New Common Stock, or the Plan, the filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the funding of the Plan, the pursuit of Confirmation, the pursuit of

7

Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement or transaction, except for claims or Causes of Action related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or actual fraud, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Revolving Exit Facility and TL Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Revolving Exit Facility and TL Exit Facility) executed to implement the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

*Id*. at Art. VIII.E (emphasis added).

## ARGUMENT

### A.  The Exculpation Provision is Impermissibly Broad.

18.    The Plan's Exculpation Provision is inconsistent with controlling case law because it insulates the Exculpated Parties (as defined in the Plan) from liability for claims or causes of action related to their actions or inactions prior to the Petition Date. It achieves prepetition exculpation by including language in the Exculpation Provision that includes activity "taking place on or before the Effective Date in connection with the Plan . . ." *Id.*

19.     As detailed in *the Declaration of Mario C. Ventresca, Jr., in Support of First Day Pleadings* (the "First Day Declaration"), the Debtors and their representatives have been in negotiations long before this Court had any jurisdiction over the cases and oversight of the actions (or inactions) taken by the Debtors and their representatives in connection with the formulation of the plan, the Restructuring Support Agreement, and other restructuring transactions. [D.I. 14, ¶¶ 10-14].

20.     The Third Circuit in *In re PWS Holding Corporation*, 228 F.3d 224 (3d Cir. 2000) articulated the standard of liability to which estate fiduciaries are held in a chapter 11 case in a plan. *See id*. at 246. This Court has consistently interpreted *PWS Holding Corporation* and uniformly held that a party's entitlement to exculpation is based upon its role or status as an estate fiduciary.  S*ee In re Washington Mutual, Inc*., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that an "exculpation clause must be limited to the fiduciaries ***who have served during the chapter 11 proceeding***: estate professionals, the Committees and their members, and the Debtors' directors and officers.") (emphasis added); *accord In re Tribune Compan*y, 464 B.R. 126, 189 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*., 486 B.R. 286, 306 (Bankr. D. Del. 2013); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *38 (Bankr. D. Del. Nov. 10, 2011) (Shannon, J.) ("courts have permitted exculpation clauses insofar as they merely state[] the standard to which ... estate fiduciaries [a]re held in a chapter 11 case.   That fiduciary standard, however, applies only to estate fiduciaries, no one else.") (internal quotations omitted). Estate fiduciaries are typically estate professionals, the Committees and their members, and the Debtors' directors and officers. *Wash. Mut.,* 442 B.R. at 350-51.

21.     Because exculpation is limited to estate fiduciaries who served in the bankruptcy case and that only exist by virtue of the bankruptcy case, exculpation must also be

limited to actions and omissions taking place during the bankruptcy case. *See Wash. Mut.*, 442 B.R. at 350 (exculpations cover "actions in the bankruptcy case") (citing *PWS*, 228 F.3d at 246).

22.    In considering the U.S. Trustee's objection to the temporal scope of the exculpation clause in *In re Mallinckrodt PLC*, 639 B.R. 837 (Bank. D. Del. 2022), the Court recently held that exculpation "only extends to conduct that occurs between the Petition Date and the effective date," and ordered the debtors to strike contrary language from the exculpation provision. *Id.* at 883.

23.    Because exculpation may be provided only to estate fiduciaries, and no estate exists until a case has been commenced under the Code, the only actions or omissions that may be exculpated are those taken between the Petition Date and the effective date of the plan. This is as true for prepackaged cases as for all other chapter 11 cases.

24.    For these reasons, unless the Exculpation Provision is narrowed consistent with *PWS*, Plan confirmation should be denied.

**B.  The Plan Proposes a Non-Consensual Third-Party Release Through Its Inclusion of Deemed Rejecting Creditors or Interest Holders and Unimpaired Creditors.**

25.    The Releasing Parties provision, as proposed, contains the following provision: "all Holders of Claims or Interests unless, as applicable, they (i) submit a ballot by the voting deadline that does not vote to accept the Plan, (ii) submit a ballot by the voting deadline that accepts the Plan but opts out of the Third-Party Release, or (iii) timely File on the docket of the Chapter 11 Cases an objection to the Third-Party Release."  By implication, those parties that do not have an opportunity to vote on the plan, such as unimpaired claimants and fully impaired claim holders, would be giving the releases without the opportunity to indicate their assent, making the releases non-consensual.

26.     The unimpaired claimants on whom Third-Party Releases[2] will be imposed appear to include holders of administrative claims and priority tax claims. The claims to be released include direct claims that unimpaired parties hold against numerous non-debtors, like the Debtors' shareholders, directors, officers, and managers.  While unimpaired creditors will be paid in full on the claims they hold against the Debtors, the scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid.  The release covers any claims against non-debtor Released Parties that are "based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale or rescission of any security of the Debtors, the business or contractual arrangements between any Debtor and any other entity, the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility Backstop Agreement, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the New Common Stock, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the Revolving Exit Facility, the TL Exit Facility, the Exit Facility Backstop Agreement, the New Common Stock, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or in all cases upon any other related act

---

[2] Capitalized terms have the meaning assigned to them in the Plan, unless otherwise defined.

or omission, transaction, agreement, event, or other occurrence taking place on or before the

Effective Date. "relating to, or in any manner arising from, in whole or in part, the Debtors." *See*

Plan at Art. VIII.D.   So, for example, a taxing authority whose priority claim against the Debtor

will be paid in full under the Plan (as required by the Code) could later be subject to an argument

by a Released Party that it has no obligation to pay taxes in connection with revenue received from

transactions with the Debtors because, under the Plan, the taxing authority has been deemed to

release the Released Party for all claims related in any manner to the Debtors.

27.     The Third-Party Releases also will be imposed on all Related Parties,

without their affirmative consent or ability to opt out of the releases, and in many instances without

their receipt of notice.

28.     Finally, the Plan will extinguish releases of direct claims against non-

debtors held by the general category of "all Holders of Claims or Interest" (with certain

exceptions). In addition to including unimpaired creditors, this also includes deemed rejecting

classes of equity holders and § 510(b) claimants. These parties have no ability to opt into the Third-

Party Release; accordingly, under the Plan their silence is sufficient to manifest assent to the Third-

Party Release.

29.     Some courts in this District have determined that third party releases of non-

debtors should be allowed only to the extent the releasing parties have given affirmative consent.

*See In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011).   In *Washington Mutual*

the Court held that "any third party release is effective only with respect to those who *affirmatively*

*consent* to it by voting in favor of the Plan and not opting out of the third party releases."   *Id.* at

355 (emphasis added).   Moreover, the Court clarified that merely having an opt out mechanism is

not enough, holding that an "opt out mechanism is not sufficient to support the third party releases

. . . particularly with respect to parties who do not return a ballot (*or are not entitled to vote in the first place*). *Failing to return a ballot is not a sufficient manifestation of consent* to a third party release." *Id.* (emphasis added) (; citing *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)).

30.    In *Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019), the Court ruled that consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form." *Id.* at *52. The Court reached this conclusion even though the Opt-Out Forms provided conspicuous notice of how to opt-out and the consequences of not doing so. The Court also rejected the Debtor's argument that inferring consent from "silence" should be approved as typical, customary, and routine. *Id.* The Court held that it could not, "on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id.* at *53.

31.    Here, the Debtors propose to impose the Third-Party Release on unimpaired creditors and deemed rejecting classes unless they file a confirmation objection. That means parties who are silent as to whether they wish to grant the Third-Party Release -- or, alternatively, are not given the opportunity to vote on the Plan -- will be deemed to grant the Third-Party Release. This Court in *Emerge* indicated that it "has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present." *Id.* at *54-55. The Court clarified that, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as such circumstances. *Id.* at *55. Those

statements would appear to apply whether a creditor or shareholder is to receive a distribution under a plan or not.[3]  In these cases, the facts are worse than *Emerge* in that these parties were not even given an "opt-out" notice at the solicitation stage. Rather, in order not to grant the Third-Party Release, these parties would have to hire counsel and file an objection to confirmation of the Plan. In the case of deemed rejecting creditors or interest holders, the requirement to file a confirmation objection when they are already receiving nothing under the Plan is particularly egregious and underscores the need for affirmative consent. In sum, the Third-Party Release should not apply to *ALL* holders of claims and interests.[4]

32.     Other decisions from Courts in this District are in accord with *Washington Mutual* and *Emerge*.  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *Zenith*, 241 B.R. at 111 (noting the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

---

[3] Although not a reported decision, the Court's ruling in *In re Kettner Investments, LLC*, Case No. 20-12366 (KBO), on February 15, 2022 [transcript – D.I. 298] indicates that the *Emerge* ruling was not limited to situations in which the parties deemed to give releases are to receive nothing under the plan.  In *Kettner*, the Court denied confirmation of a proposed plan of reorganization because it deemed third-party releases to be given by creditors and interest holders in ***unimpaired*** classes, as well as by related parties to such creditors, without obtaining their affirmative consent.

[4] Even if the Debtors remove all interest holders from the definition of Releasing Parties, the equity holders and shareholders of the Debtors would still be Releasing Parties through the inclusion of Related Parties. To fully address the U.S. Trustee's objection on this issue, the Related Parties definition should also be pared down.

33.     Not all decisions from this District have required affirmative consent for third party releases.  In *In re Indianapolis Downs, LLC*, 486 B. R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Washington Mutual* and *Emerge*, and the other cases cited above, concerning the need for affirmative consent to third party releases.  In so doing, however, the Court pointed out that, "the third party release provision does not apply to any party that is deemed to reject the Plan." *Id.* at 305.[5]

34.     Requiring affirmative consent from creditors to release their direct claims against non-debtors is the only way to ensure there is true consent, rather than consent assumed by silence, which could be caused by factors such as "carelessness, inattentiveness, or mistake," as recognized by this Court in *Emerge,* 2019 Bankr. LEXIS 3717 at * 53, or caused by a package being misdelivered, or other post-office failures, delays, or unforeseen issues.  In a recent decision, the District Court for the Eastern District of Virginia vacated an order of the Bankruptcy Court confirming a plan which deemed consent to third party releases from parties who did not return opt-out forms.  *See Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022).  The Court found that:

> [T]he Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual.  Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case there is a lack of sufficient affirmation of consent.

---

[5] *See also In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del 2010), (the Court held that affirmative consent was not required, but only as to releases being given by unimpaired classes who were "being paid in full.") *Id.* at 144; *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022), (this Court allowed third-party releases to be imposed on mass tort claimants without the opportunity to opt-out, as well as on certain other classes of creditors and equity holders who were provided the ability to opt-out, holding that the imposition of such releases were permissible under *Continental* because of the mass tort context of the case.) 639 B.R. at 873, 880; *In re Boy Scouts of America,* 642 B.R. 504, 674-78 (Bankr. D. Del. 2022) (approving an opt-out process for third-party releases in a mass tort case, but noting that the definition of parties giving such releases did not include any "claimant who abstains from voting").

*Id.* at 688 (emphasis added).

35.     Several decisions from the Bankruptcy Court for the Southern District of New York have reached the same conclusion.  In *In re Chassix Holdings*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the court held that third party releases must be limited to those who voted to accept the plan, or affirmatively elected to provide releases.  Creditors in voting classes who failed to return a ballot, as well as unimpaired creditors, would not be deemed to have consented to give third party releases.  *Id.* at 79-80.  In *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr, S.D.N.Y. 2017), the court held that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result.

36.     Under the holding of *Emerge Energy*, *Washington Mutual*, and the other cases cited above, the Debtors' Third-Party Releases render the Plan unconfirmable because they release direct claims against non-debtor parties held by (i) other non-debtor parties without their affirmative consent, including those who do not return a ballot, (ii) parties who are not entitled to vote and are not being provided with opt-in forms (or even opt-out forms), such as the unimpaired and fully impaired classes.  Releases from all such persons and entities are simply not consensual, and therefore should not be allowed.

**C.  The Plan Does Not Meet the Requirements for Non-Consensual Releases**

37.     In *Continental*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third-party release is permissible. The Court acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances.  *See id.* at 212.  Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases."  *Id.* at 212-13 (citing Second Circuit

cases where releases were upheld for "widespread claims against co-liable parties" and a Fourth Circuit mass tort case). "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible." *Id.* at 213; *see also, In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (noting a third party release may be granted "only in rare cases").

38.     The Third Circuit in *Continental* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." 203 F.3d at 214. Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Id.* at 214, n. 11. However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

39.     The Third Circuit Court of Appeals referenced *Continental* in *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding nonconsensual third-party releases. The Third Circuit indicated that these decisions "set forth *exacting standards* that must be satisfied if such releases and injunctions are to be permitted." 945 F.3d at 139 (emphasis added).[6]

---

[6] Although not directly addressed by the Third Circuit in *Continental*, *Millennium Lab* or *Global Indus.*, the issue of whether the bankruptcy court has statutory authority to confirm a plan that includes non-consensual releases between non-debtors is on appeal the United States Supreme Court in *Harrington v. Purdue Pharma, L.P.,* No. 23-124.

40.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration. *Id.* at 607. The Court elaborated that "necessity" under *Continental* requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *Id.* at 607. A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible. *Id.* Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *Id.* at 608; *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010).

41.     The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money." *Id.* at 608. Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts . . . . [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

42.     In the present cases, there is nothing in the record to indicate the presence of "extraordinary circumstances," or that that the high threshold necessary for approval of non-

consensual third party releases has been met with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases.   As to the first *Continental* requirement, it is unclear what, if any, "necessity to the reorganization" such non-consensual releases have.  As to the second *Continental* requirement, that the releases be given "in exchange for fair consideration," the Debtors must establish what, if any, "critical financial contribution" was made by each and every recipient of the Third-Party Releases, and how such contribution benefits those parties on whom the non-consensual releases are being imposed.  As to the unimpaired parties, like administrative claimants, those parties are receiving the payment which they are entitled to receive under the Code, which is a requirement for confirmation.   Deemed rejecting equity holders will receive no distribution under the Plan.[7] The same is true as to the equity holders in Classes 8A-C which are deemed to reject the Plan.  In that case no member of those classes will receive a distribution but will have the Third-Party Releases imposed upon them.

43.     Thus, both the "exchange for fair consideration" and "necessity to the reorganization" elements specified in *Continental* appear to be absent here.  Therefore, the Plan cannot be confirmed with the inclusion of the non-consensual third party releases.  *See Continental*, 203 F.3d at 214 and n. 11.

44.     As to the Debtors' current and former directors and officers, who are among the beneficiaries of the Third-Party Releases through the Related Parties provision, the Third Circuit Court of Appeals and this Court have already determined that they are not entitled to third party releases.  *See PWS Holding,* 228 F.3d  at 245-46 ("§ 524(e) makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers

---

[7] The Plan does provide for a "gift" of a maximum $10 million dollars from the prepetition lenders to existing equity holders contingent on no equity committee being appointed and those equity holders refraining from taking actions in the cases that would result in a delay of plan confirmation. The U.S. Trustee believes this is coercive, rather than "necessary to the reorganization," as the equity holders are already deemed to reject. See Plan Art. I.A. 45-47.

of the debtor for the debt discharged in bankruptcy."); *Continental*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Washington Mutual*, 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors, even if it is limited to their post-petition activity. The only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan. Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them. . . ."); *see also Genesis*, 266 B.R. at 606–07 (in rejecting a *debtor*'s release of its directors, officers and employees, the Court held that, "the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

45.     The same logic is also applicable to Third-Party Releases of the Debtors' professionals who, like the Debtors' directors and officers, will be protected by the exculpation provision. *See Washington Mutual,* 442 B.R. at 354.

46.     The Debtors have the burden of establishing whether any of the *Continental/Genesis* factors have been met for each of the non-debtors who are the beneficiaries of non-consensual Third-Party Releases.   The Debtors should not be allowed the unfettered discretion to force creditors to discharge non-debtors from liability, because a permanent injunction limiting the liability of non-debtor parties is a rare thing that should not be considered absent a showing of "extraordinary circumstances."   *See Continental*, 203 F.3d at 212; *Tribune*,

464 B.R. at 178 (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

47.     The U.S. Trustee requests that the Court not confirm the Plan with the non-consensual Third-Party Releases.

**D. Unimpaired General Unsecured Creditors Are Impaired by the Plan Through the Release and Injunction Provisions.**

48.     The U.S. Trustee objects to confirmation of the Debtors' Plan, because, while the Plan purports to leave certain non-voting classes "unimpaired," the Plan in fact impairs such classes through its release, discharge and injunction provisions.  Under the Plan, all holders of Claims or Equity Interests in the Debtors will be deemed to release and discharge the Debtors, as well as a long list of non-debtor parties, of all claims having anything to do with the Debtors. These releases and discharges will be effectuated on the Effective Date, despite the fact that many unimpaired creditors will not be receiving any payment on their claims until sometime after the Effective Date.

49.     In *In re Genesis Health Ventures, Inc*., 266 B.R. 591 (Bankr. D. Del. 2001), this Court held that the plan proponent bears the burden of proof with respect to confirmability of a Plan: "The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of '1129, regardless of the absence of valid objections to confirmation." 266 B.R. at 599.  This Court further stated: "A nonconsensual plan requires the proponent to prove all but one of the thirteen elements [of 11 U.S.C. ' 1129(a)], that all classes consent or are unimpaired, 11 U.S.C. ' 1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable."  266 B.R. at 599; see also *In re Armstrong World Industries, Inc*., 432 F.3d 507, 511 (3d Cir. 2005). The Debtors fail to meet these standards, as detailed below.

50.     A class of claims is impaired pursuant to 11 U.S.C. §1124(1) unless the plan: "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."   A class of impaired claims is entitled to vote on a Plan pursuant to 11 U.S.C. §1126(a).

51.     There are numerous provisions of the Debtors' Plan that act as a release by unimpaired and impaired classes of claims against the Debtors and non-debtor third-parties, act as an injunction against the pursuit of such claims, or give the Debtors or non-debtor third-parties a discharge of such claims.

52.     All of the above release, discharge and injunction provisions that benefit the Debtors and non-debtor third-parties take effect on the Effective Date, even though many of the claims of unimpaired parties will not be paid by such date.   To the extent such release, discharge and injunction provisions benefit the Debtors, they contradict other provisions of the Plan which allow unimpaired parties to pursue their Claims against the Debtors in any court in which claims could have been brought absent the bankruptcy filing.   *See* Plan Art. III.C. But if such claims against the Debtors are released pursuant to the terms of the Plan, there will be nothing for such supposedly unimpaired creditors to pursue, which unquestionably results in an impairment of such creditor's claim.

53.     The claims of the purported unimpaired classes are also impaired by the provisions found in Article VIII of the Plan, which release, discharge and enjoin claims held by all of the Debtors' creditors, including those holding unimpaired claims.   The releases, discharges and injunctions in favor of the non-debtor third-parties take effect on the Effective Date, even though many of the claims of the unimpaired classes might not be paid until sometime thereafter.   Thus, an unimpaired claimant that holds a claim against the Debtors that is, for example, guaranteed by

a non-debtor, would be enjoined from ever pursuing its claim against the non-debtor under the guarantee, even if the Debtors never paid the "unimpaired" underlying claim.

54.    The U.S. Trustee proposes that the Debtors modify the Plan to add the following provision, which would ameliorate the problem posed by the release, discharge and injunction provisions in favor of the Debtors to a degree:

> Notwithstanding anything to the contrary in the Plan, Plan Supplement or Confirmation Order, until a Claim arising prior to the Effective Date in Plan Class 5 or which is an Administrative Claim or Priority Tax Claim (collectively, the "Unimpaired Claims") has been (x) paid in full in accordance with applicable law, or on terms agreed to between the holder of such Claim and the Debtors or Reorganized Debtors, or in accordance with the terms and conditions of the particular transaction giving rise to such Claim or (y) otherwise satisfied or disposed of as determined by a court of competent jurisdiction: (a) the provisions of Plan sections VII(A) (Discharge of Claims and Termination of Interests in Debtors), VII(D) (Releases by the Releasing Parties),  VII(F) (Injunction), and VII(C) (Debtor Release), but as to VII(C) (Debtor Release) only to the extent that such provision releases claims that could be asserted derivatively by the holder of such Claim, shall not apply or take effect with respect to such Claim, (b) such Claim shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined, (c) the property of each of the Debtors' Estates that vests in the applicable Reorganized Debtor pursuant to the Plan shall not be free and clear of such Claims, and (d) any Liens of Holders of Unimpaired Claims shall not be deemed released.

55.    The above provision would resolve the problem of the Plan providing for releases by unimpaired claimants in favor of Debtors and third parties before such claimant's claims are paid in full.

## <u>CONCLUSION</u>

WHEREFORE, the U.S. Trustee respectfully requests that the Court, consistent with this

Objection, deny confirmation of the Plan.

Dated: January 16, 2023
        Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**

By:  /s/ *Joseph F. Cudia*
       Joseph F. Cudia
       Trial Attorney
       United States Department of Justice
       Office of the United States Trustee
       J. Caleb Boggs Federal Building
       844 King Street, Suite 2207, Lockbox35
       Wilmington, Delaware 19801
       Phone: (302) 573-6492
       Fax:    (302) 573-6497
Email: joseph.cudia@usdoj.gov